

# IN THE
# TENTH COURT OF APPEALS

### No. 10-11-00334-CR

**BONITA CATHERINE BUTLER,**

**Appellant**

**v.**

**THE STATE OF TEXAS,**

**Appellee**

### From the 85th District Court
### Brazos County, Texas
### Trial Court No. 08-05623-CRF-85

## MEMORANDUM OPINION

A jury convicted Appellant Bonita Butler of felony DWI, and the trial court assessed her punishment at three years' imprisonment. This appeal ensued.

### Sufficiency of the Evidence

In her first issue, Butler contends that the evidence is "legally insufficient" to support a finding of guilt. The Court of Criminal Appeals has expressed our standard of review of a sufficiency issue as follows:

> In determining whether the evidence is legally sufficient to support a conviction, a reviewing court must consider all of the evidence in the light most favorable to the verdict and determine whether, based on that

> evidence and reasonable inferences therefrom, a rational fact finder could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). This "familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319. "Each fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Hooper*, 214 S.W.3d at 13.

*Lucio v. State*, 351 S.W.3d 878, 894 (Tex. Crim. App. 2011), *cert. denied*, 132 S. Ct. 2712 (2012).

The Court of Criminal Appeals has also explained that our review of "all of the evidence" includes evidence that was properly and improperly admitted. *Conner v. State*, 67 S.W.3d 192, 197 (Tex. Crim. App. 2001). And if the record supports conflicting inferences, we must presume that the factfinder resolved the conflicts in favor of the prosecution and therefore defer to that determination. *Jackson*, 443 U.S. at 326. Further, direct and circumstantial evidence are treated equally: "Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper*, 214 S.W.3d at 13. Finally, it is well established that the factfinder is entitled to judge the credibility of witnesses and can choose to believe all, some, or none of the testimony presented by the parties. *Chambers v. State*, 805 S.W.2d 459, 461 (Tex. Crim. App. 1991).

A person commits the offense of driving while intoxicated if the person is intoxicated while operating a motor vehicle in a public place. TEX. PENAL CODE ANN. § 49.04(a) (West Supp. 2012). As limited by the indictment, "intoxicated" means "not

having the normal use of mental or physical faculties by reason of the introduction of alcohol . . . into the body." *Id.* § 49.01(2)(A) (West 2011). The DWI is a felony of the third degree if it is shown that the person has previously been convicted two times of any other offense relating to the operation of a motor vehicle while intoxicated. *Id.* § 49.09(b)(2) (West Supp. 2012).

The evidence presented in this case, viewed in the light most favorable to the verdict, is as follows: Casie Carpenter testified that she was in Brazos County on July 22, 2008 for annual firefighter training and was staying at the Super 8 Motel. She and others were sitting outside the motel when she observed a vehicle driving erratically. The vehicle would creep by the front doors of the motel and then speed up to about thirty miles per hour and circle out of the parking lot onto the street. Carpenter stated that the vehicle came through the parking lot at least eight times. At some point, Butler, the driver of the vehicle, parked in front of the doors to the hotel and got out of the vehicle. Carpenter said that Butler could barely stand up. Her pants were wet, and she smelled of urine. Carpenter also noticed a strong odor of alcohol coming from Butler's person. When she conversed with the group outside the motel, Butler's speech was a little slurred. In Carpenter's opinion, Butler was intoxicated. Someone in the group outside the motel called the police, and Carpenter saw someone else take Butler's keys.

Firefighter Norman Langwell testified that he was in Brazos County on July 22, 2008 for a week-long emergency care attendant course at Texas A&M. He was staying at the dorms on campus but had gone over to the Super 8 Motel to visit friends. They were all standing outside the motel talking. He noticed a parked car "just sitting there"

with its lights on, which struck him as odd. The vehicle then took off and drove through the parking lot really fast and left. About five minutes later, the vehicle came back, parked in the same spot, and then left again. The vehicle circled the parking lot three or four times. After observing the vehicle for about forty-five minutes to an hour, he decided to call 911 and went inside to do so. On cross-examination, Langwell stated that testimony that the vehicle was creeping past where they were standing would be different than his testimony.

Langwell testified that the last time that the vehicle came in front of them, Butler, the driver of the vehicle, stopped in front of the motel and went to get out of the vehicle. Those in front of the motel had been paying attention to her, so they went toward her vehicle. Butler seemed to be very off balance and was having trouble getting out of the car. As he approached, Langwell could smell the strong odor of alcohol on Butler's breath. Butler's behavior was odd. She asked them if they wanted to go swimming in her swimming pool. Langwell testified that he has come into contact with intoxicated individuals on many occasions and that he believed Butler was intoxicated. He stated that no one was aggressive toward her or made any inappropriate sexual advances toward her. One person in the group did take her keys at some point.

On cross-examination, Langwell acknowledged that he believed there probably were people drinking at the motel that night, but he stated that he could not identify them. He testified that he did not consume any alcohol that night, and he is not sure if Carpenter consumed any alcohol that night.

Firefighter/paramedic Travis Updegraff testified that he was also in College

Station in July 2008 for training and was staying at the Super 8 Motel. He was walking back to the motel when he saw a group of people standing outside. He asked what was going on and was told that a woman was driving erratically around the parking lot. They told him that the police had been called, so he knew they were on the way. He saw the vehicle with the woman in it and recalled her getting out of the vehicle and walking around for a minute. He has training identifying intoxicated people, and he assumed she was intoxicated. His assumption was based mainly on what other people had told him, but he stated that it seemed like there was an alcohol container in her vehicle. When she got back in the vehicle, Updegraff felt that she was a danger to drive, so he reached through the open driver's side window and took the keys out of the ignition. When the police officer arrived, Updegraff told the officer what happened and gave the keys to him.

On cross-examination, Updegraff acknowledged that he had been drinking that night. When asked on redirect how much he had to drink, he replied, "I can't assume that we were drinking that much. Maybe, like, four. That would be probably a good estimate -- between, you know, probably four a piece maybe."

College Station Police Officer Stephen Scholleman testified that at about 10:00 p.m. on July 22, 2008, he was dispatched to the Super 8 Motel where witnesses believed that a woman who had been driving her vehicle in the parking lot was intoxicated. When Scholleman arrived at the motel, he saw several people standing in a group near the front doors of the motel and a blue Ford Escape parked abnormally nearby. The vehicle was turned off, the driver's door was open, the driver (later identified as Butler)

was sitting in the driver's seat, and an individual was standing a short distance from the driver's side of the vehicle.

Scholleman testified that he approached Butler and asked her what she was doing. Butler replied that she had gone to the Sonic directly across the street from the motel to get a drink and was trying to go home but pulled into the motel parking lot to talk to her daughter on her cell phone. Butler told him that she was a little upset because she had gotten into an argument with her daughter earlier in the evening. Scholleman did not see a Sonic cup in Butler's vehicle but did see an open can of Bud Light beer in the center console cup holder.

Scholleman testified that he talked to the witnesses and then came back to talk to Butler. When he confronted Butler with what the witnesses had told him, Butler then told him that she thought that she had been sexually assaulted because one of the men had reached into her vehicle and touched her inappropriately. When Scholleman asked her which man had done that, Butler could not point out which one it was because there were so many people outside. Scholleman stated that Butler was not making much sense.

Scholleman testified that he then talked to the witnesses again about this new accusation. The witnesses' accounts of the events were all consistent that the sexual assault did not occur, and their stories had not changed. When asked on cross-examination if the witnesses had been drinking, Scholleman replied, "That I cannot tell you." But Scholleman said that none of the witnesses appeared to be intoxicated. Scholleman went to speak to Butler again, and at this point, Butler told him that the

people had taken her keys from her "and/or" assaulted her. Scholleman stated that he did not know what that meant. He explained to Butler that the witnesses had all told him that they had not assaulted her and that there was no evidence other than her story that anyone had actually assaulted her.

Scholleman testified that there was a strong odor of an alcoholic beverage coming from Butler's breath the entire time that he talked to her. Butler had bloodshot, glassy eyes and slurred speech, which are also common indicators of someone who has been consuming alcohol. Scholleman had also seen the open beer in Butler's car; therefore, he decided to have Butler perform the standardized field sobriety tests, and she cooperated.

Scholleman testified that he started with the horizontal gaze nystagmus test. Butler appeared to be a good candidate for the test but did not follow his directions and was therefore unable to perform the test. Butler moved her entire head with the stimulus instead of just her eyes throughout the six attempts he permitted her. Scholleman stated that Butler also did not successfully complete the walk-and-turn test even though he gave her three opportunities to perform it. Scholleman said that he saw all eight clues on the test even though Butler never really got past the very beginning of the test. Finally, Scholleman had Butler perform the one-leg stand test, and Butler exhibited all four clues on the test.

Scholleman testified that at that point, he determined that Butler was intoxicated and placed her under arrest. He then searched Butler's vehicle. When asked if he found any other alcohol in the vehicle, Scholleman replied that he found another 24-

ounce Bud Light beer can in the backseat on the floor. It was still cold and sweating like it had been purchased recently. The beer can in the console was empty, but Scholleman could tell that it had been consumed recently. It was also still sweating.

Scholleman testified that he took Butler to the police department jail. On cross-examination, Scholleman acknowledged that Butler asked several logical questions in the car on the way to the jail, but Scholleman said that the questions were normal questions asked by DWI arrestees. Once in the intoxilyzer room, Scholleman read Butler the statutory warnings and requested a sample of her breath or blood. Butler refused to provide either a breath or blood sample. Butler was then given her *Miranda* warnings, and she waived her right to remain silent. Butler admitted to Scholleman that she had been driving that night, that she had consumed three 24-ounce beers, and that her last drink was at 9:30 p.m. Butler said that she had been to the doctor three weeks before for ADHD and to stop smoking but that she was not ill. She noted that she had taken her Adderall prescription that day at 9:00 a.m. Scholleman stated that based on all his observations, he believed that Butler had lost the normal use of her mental or physical faculties due to drinking alcohol and was intoxicated while driving a vehicle that night.

The in-car video recording was admitted into evidence. Although it should have included full audio, it did not record any conversation with Scholleman from his body microphone. The recording did include the conversation when Butler was seated in the car urging her sobriety and inquiring about how she would be released. Although almost inaudible, the video also contained the conversation between Scholleman and

Butler after they arrived in the intoxilyzer room.

William Reeder, a certified drug recognition expert, testified that he had never met Butler but that he had reviewed the offense report as well as the in-car video recording. In his opinion, Butler was intoxicated by alcohol and a central nervous system stimulant, such as Adderall. Reeder stated that his opinion would not be affected even if the witnesses had consumed alcohol that evening. He explained that the witnesses having consumed alcohol had nothing to do with Butler's mannerisms, her actions, the statements she made, and her driving that evening.

On the other hand, Peggy Moore testified that Butler had cleaned her house twice a week for about five or six years. Moore had watched the DVD of the traffic stop, and in her opinion, Butler was not slurring her words but sounded tired. Also, Butler's gait and movement in the hotel parking lot seemed within what she would expect from Butler.

Butler testified that she was not intoxicated on the night of July 22, 2008. She had become upset earlier that evening when she found a pornography website in the computer history under her daughter's log-in. She left her house, went to an Exxon station, and bought two 24-ounce cans of Bud Light. She then made a phone call to her mother and continued driving. She stopped at the Sonic across the street from the Super 8 Motel and bought a 32-ounce coke. It eventually spilled on the passenger side.[1] She pulled into the Super 8 Motel and continued talking to her mother. The call with her mother was about ten or fifteen minutes long.

---

[1] She found the Sonic cup the next day under her passenger seat.

Butler testified that she made a circle of the parking lot, stopped by the group of people outside the motel, and asked if anyone knew her friend, a firefighter who was also in town. She did not turn the car off, and her windows were down. Butler stated that she had not consumed any alcohol at that point, she had not driven through the parking lot in the manner described by Carpenter and Langwell, and she had only driven by the front doors of the motel where the group of people were standing once.

Butler testified that Updegraff approached her vehicle and asked her to go up to his room with him. She told him that she was married. He nevertheless reached in to grab her car keys and told her that she was not going anywhere. She got the keys first and put them between her legs near her knees. Updegraff then grabbed the keys and "went down between my legs" and said, "Shut up, bitch. You liked it." He then told her that he did not have the keys, but she never saw him interact with anyone else. Updegraff never left the side of her car until the police officer arrived.

Butler testified that after Updegraff had taken her keys away from her, she opened one of the 24-ounce cans of beer that she had purchased at the Exxon station. She had only taken three or four sips of it when the officer arrived. She does not know why she told Scholleman that she had had three 24-ounce cans of beer. She has never drunk three 24-ounce beers, and at the time of the incident, it had been over four years since she had had anything to drink. She had had two previous DWI's, but she is not an alcoholic. The State and Butler had stipulated that Butler had two previous DWI convictions. Butler stated that she was also prescribed three 20-milligram tablets of Adderall per day, and she took under the recommended dosage. She had only taken

the 9 a.m. and noon tablet.

Butler argues that the foregoing is "legally insufficient" to support her conviction because the witnesses to her alleged bad driving had been drinking alcohol before taking her keys and calling the police and because there was sufficient evidence that her behavior on the evening was within the normal range for her personally. Butler also notes that Updegraff testified that he did not see her drive, he took her keys only because he "assumed that something was wrong," and he did not smell alcohol on her breath even though he was close enough to take her keys from the ignition.

But the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to be given to the witnesses' testimony. *Jaggers v. State*, 125 S.W.3d 661, 672 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). A jury may believe all, some, or none of any witness's testimony. *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986). Here, by finding Butler guilty, the jury obviously believed the State's evidence and the testimony of the State's witnesses and rejected Butler's testimony. As the reviewing court, we "should not substantially intrude upon the jury's role as the sole judge of the weight and credibility of witness testimony." *Vasquez v. State*, 67 S.W.3d 229, 236 (Tex. Crim. App. 2002).

Viewing all the evidence in the light most favorable to the verdict, we thus conclude that a rational trier of fact could have found Butler committed the offense of felony DWI beyond a reasonable doubt. We overrule Butler's first issue.

### Denial of Request for Mistrial

In her second issue, Butler contends that the trial court improperly denied her

request for a mistrial after it sustained her objection to improper impeachment.

The State was cross-examining Butler when the following exchange occurred:

> Q        I want to talk about your previous alcohol usage.  Isn't it true that you were placed on deferred for injury to a child --
>
> [Defense Counsel]:  Objection, Judge. . . .
>
> . . . .
>
> (Jury not present)
>
> . . . .
>
> [Defense Counsel]:   I would object to that question as improper impeachment.
>
> THE COURT:  Well, that's sustained.
>
> [Defense Counsel]:  Outside the presence of the jury I would ask that the -- my objection -- or the objection be sustained in front of the jury.  I will be asking for an instruction to disregard, and I will be asking for a mistrial based upon the phrasing of that particular question.
>
> THE COURT:  And your response to any of that?
>
> [Prosecutor]:  No -- Judge, I don't think it's necessary to have a mistrial based on the phrasing of the question with regard to -- I can withdraw the question.  We can -- there can be an instruction to the jury -- I can go into the fact that she wasn't convicted of it -- I don't think that it warrants a mistrial.
>
> [Prosecutor #2]:  Well, I don't think that we need to go into it any further.  I think a limiting instruction from the Court will suffice, and we just will not speak any further about any type of deferred -- being placed on probation.  Think only talking about it further highlights it in front of the jury.  I think [Defense Counsel] would agree.
>
> [Defense Counsel]:  I agree with that; but, of course, it's my contention that the skunk is already in the jury box.
>     Again, I would urge the Court to give an instruction to disregard because I'm required to under the law in order to preserve.

THE COURT: Okay. When the jury returns, I'll sustain your objection in front of the jury's presence. Your request for an instruction to disregard will be granted, and the jury will be instructed to disregard it. And then the Court will deny your . . . motion for mistrial.

The jury returned to the courtroom.

[Defense Counsel]: Judge, can I -- we'd request a ruling on my objection as stated.

THE COURT: The defendant's objection is sustained.

[Defense Counsel]: Judge, I would request a -- the jury be instructed to disregard the last question that was partially asked by the prosecutor.

THE COURT: The jury is instructed to disregard the prosecutor's last question for any purpose whatsoever and make no inference from the question in any manner in determining any issue the jury might have to decide in this case.

[Defense Counsel]: Judge, very regretfully but under law I'm required to request a mistrial.

THE COURT: Denied.

When the trial court sustains the defense's objection, grants the requested instruction to disregard, but denies the motion for mistrial, the proper issue is whether the refusal to grant the mistrial was an abuse of discretion. *Hawkins v. State*, 135 S.W.3d 72, 76-77 (Tex. Crim. App. 2004). "Only in extreme circumstances, where the prejudice is incurable, will a mistrial be required." *Archie v. State*, 221 S.W.3d 695, 699 (Tex. Crim. App. 2007) (quoting *Hawkins*, 135 S.W.3d at 77). A prompt instruction to disregard will ordinarily cure any prejudice associated with an improper question and answer, even one regarding extraneous offenses. *Ovalle v. State*, 13 S.W.3d 774, 783 (Tex. Crim. App. 2000).

After reviewing the record, we conclude that the prosecutor's question was not so extreme that prejudice, if any, could not be cured by the trial court's prompt instruction to disregard. Accordingly, the trial court did not abuse its discretion in denying Butler's motion for mistrial, and her second issue is overruled.

**Reading the Enhancement Allegations in the Indictment**

In her third issue, Butler contends that the reading of the allegations of her two previous DWI convictions during guilt/innocence was unnecessary and harmful in light of her stipulation to the convictions. We disagree. The Court of Criminal Appeals has recognized that, in cases where the defendant agrees to stipulate to the two previous DWI convictions, the two jurisdictional prior convictions can be included in the reading of the indictment to the jury. *Martin v. State*, 200 S.W.3d 635, 640 (Tex. Crim. App. 2006); *Hollen v. State*, 117 S.W.3d 798, 801 (Tex. Crim. App. 2003); *Tamez v. State*, 11 S.W.3d 198, 202 (Tex. Crim. App. 2000). We overrule Butler's third issue.

**Conclusion**

Having overruled all three of Butler's issues, we affirm the trial court's judgment.


REX D. DAVIS
Justice

Before Chief Justice Gray,
     Justice Davis, and
     Justice Scoggins
Affirmed
Opinion delivered and filed August 15, 2013
Do not publish
[CR25]